IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------- :
UNITED STATES OF AMERICA,      :  CASE NO.  5:11 CR 00084
      :
      :
           Plaintiff,    :  <u>MEMORANDUM OF OPINION AND</u>
      :  <u>ORDER DENYING THE DEFENDANTS'</u>
    -vs-    :  <u>MOTIONS TO SUPPRESS</u>
      :
      :
DEONDRAY ONEAL BRADLEY, et al,   :
      :
          Defendants.
-------------------------------------------------------

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Before the Court are motions to suppress filed by the defendants Deondray

Oneal Bradley and Faith Blanks. (Doc. 52 - 56). The defendants challenge the

constitutionality of the police action that led to the seizure of approximately 80 grams of

heroin and their arrest and indictment on drug charges.  The Court held a suppression

hearing on the 6th and 7th of September 2012, and the issues have been briefed by the

parties. For the reasons that follow, the motions will be denied.

**I. Background**

While not initially targets, Defendants Mr. Bradley and Ms. Blanks were swept

into a drug investigation being conducted by the Summit County Drug Unit and the

Akron Police Department. (Th. Hearing at 32). On the afternoon of 9 February 2011,

investigators were planning a controlled drug buy from another subject named Brian

Carper, known to police as a heroin dealer. (Th. Hearing at 32). Investigators met with a confidential informant ("informant"), who agreed to contact Mr. Carper. (Th. Hearing at 33-34). In a recorded phone call, Carper agreed to sell the informant heroin. (Th. Hearing at 33).

Investigators searched the informant and his car, outfitted him with a wire, and provided him with $300 in marked buy money. (Th. Hearing at 34, 69). The informant met with Mr. Carper, and they had a conversation, which was monitored by the police. (Thu. Hearing at 34-35). It was discovered that before a deal could happen, Mr. Carper needed to meet his heroin supplier "Chuck." (Th. Hearing at 34-35). Officers were aware that the defendant Mr. Bradley goes by the nickname "Chuck" and that he had previous drug felonies. (Thu. Hearing at 39, 80; Fri. Hearing at 26). On the suspicion that Mr. Carper's "Chuck" was in fact Deondray Bradley, officers positioned Detective Tim Harvey outside Mr. Bradley's known residence at 475 Center Avenue, Apartment 11, Cuyahoga Falls, Ohio, to see whether Bradley came or left. (Th. Hearing at 39-40; Fri. Hearing at 106).

After Mr. Carper's initial plans to meet "Chuck" at a Circle K gas station were aborted, he and "Chuck" decided they would meet at a self-service car wash. (Th. Hearing at 38). The car wash they selected had multiple wash bays, and it was situated in such a way that an occupant of a bay could not be seen from the street. (Thu. Hearing at 42). Mr. Carper and the informant parked inside one of the bays, and they waited. (Thu. Hearing at 40). Other individuals were also waiting in cars parked on the premises. (Thu. Hearing at 43). Around this time, the detective watching Center Avenue

2

observed Mr. Bradley leave the apartment. (Thu. Hearing at 41). A surveillance team followed him as he drove to the car wash. (Thu. Hearing at 41).

When Mr. Bradley arrived, he pulled into a bay, and Mr. Carper announced to the informant, "that's my guy." (Thu. Hearing 42). Mr. Carper exited the car, with the CI still inside, and entered Mr. Bradley's bay. (Thu. Hearing at 42). While Carper and Bradley were together, the police lost both visual and audio surveillance. (Thu. Hearing at 42). Mr. Carper returned to his car after about 20 seconds. (Thu. Hearing at 42). Then, individuals from the other waiting cars also briefly visited Mr. Bradley's bay. (Thu. Hearing at 43). Everyone returned to their cars and drove off. (Thu. Hearing at 43). A testifying agent believed, based on his training and experience and what had occurred up to that moment, that a drug transaction occurred during this meeting, but he admitted that officers did not visually observe the physical exchange of heroin and money. (Thu. Hearing at 43).

Immediately thereafter, officers stopped Mr. Bradley. (Thu Hearing at 45). Government witnesses testified that prior to the stop officers also knew that Mr. Bradley's driver's license had been suspended. (Thu. Hearing at 98-99). The stop and search uncovered $1,082 in cash on Mr. Bradley's person, one hundred dollars of which was later identified as marked buy money. (Thu. Hearing at 48, 100). It is undisputed that no drugs were found on Mr. Bradley. (Fri. Hearing at 85). According to the warrant affidavit, while he was detained Mr. Bradley told an officer that they "will find something" in the Center Avenue Apartment. (Def. Ex. A). Mr. Bradley denies making this or any statement and contends that officers did not read his Miranda rights. At the suppression hearing, the officers who arrested Mr. Bradley admitted that they did not Mirandize Mr.

3

Bradley. (Thu. Hearing at 158; Fri. Hearing at 92). The officers could not recall whether Bradley made the alleged statement. (Fri. Hearing at 93).

Meanwhile, as Mr. Bradley was being arrested, officers followed Mr. Carper and the informant. (Thu. Hearing at 46). Carper went home, and the informant joined officers at a meet location, where he surrendered 30 bindles of heroin. (Thu. Hearing at 46). From there, officers began preparing an application for a search warrant of the Center Avenue apartment. (Thu. Hearing at 46-47).

Before the search warrant was obtained, Det. Harvey sat in his car, staked out, across the way from the Center Avenue apartment. (Fri. Hearing at 111). The detective was aware that Mr. Bradley had been arrested and believed that a search warrant would be forthcoming. (Fri. Hearing at 111-12). His role there amounted to what he characterized as "pre-raid surveillance." (Fri. Hearing at 112).  Shortly after Bradley's arrest, a car driven by Faith Blanks pulled into the apartment parking lot, and she exited the vehicle. (Fri. Hearing at 131-32). Det. Harvey testified that, at the time, he did not know the driver's identity, having never seen Ms. Blanks before. (Fri. Hearing at 133, 136). He was, however, familiar with the car she was driving, as he knew it to have some association with Mr. Bradley. (Fri. Hearing at 113, 136-37).

Suspecting that Ms. Blanks was headed for the apartment, Det. Harvey called for uniformed back up, but no one was available. (Fri. Hearing at 113). Left with no other choice, in his mind, he pulled into the apartment parking lot, exited his vehicle, and followed Ms. Blanks up the steps. (Fri. Hearing at 138-39, 154). By the time he reached the top, she was approaching the door of the apartment. (Fri. Hearing at 139). He moved briskly, and pulled out his gun and his badge. (Fri. Hearing at 140).  He

4

approached and ordered Ms. Blanks to stop. (Fri. Hearing at 140). She was startled, apparently unaware that he was after her. (Fri. Hearing at 140). At this time, according to Det. Harvey, she had already unlocked and opened the door. (Fri. Hearing at 140-41). Ms. Blanks testified differently, stating that she had unlocked, but not yet opened, the door. (Fri. Hearing at 182). Ms. Blanks testified that Det. Harvey, not she, opened the door. (Fri. Hearing at 183). Det. Harvey handcuffed her, and he peered into her apartment and saw two or three closed doors inside. (Fri. Hearing at 140-41).

Det. Harvey was concerned that others might be inside the apartment, particularly behind the closed doors. (Fri. Hearing at 114-15). He testified that he asked Ms. Blanks whether someone else was inside, but he could not remember what her answer was. (Fri. Hearing at 143). He stated that "[he] was going to check the apartment whether she told [him] there was somebody there or not." (Fri. Hearing at 143). He entered the residence and conducted a "protective sweep." (Fri. Hearing at 114-16). Det. Harvey testified that the initial sweep took him about 30 seconds, while Ms. Blanks claimed that the detective spent about five minutes in the bedroom while she sat handcuffed in the kitchen. (Fri. Hearing at 159; Fri. Hearing at 184). According to Det. Harvey, after concluding that no one else was there, he moved Ms. Blanks into the kitchen area. (Fri. Hearing at 116). He sat her down at the table, where he noticed brown residue on the tabletop. (Fri. Hearing at 116). He also noted a number of cut up lottery tickets, which are commonly used to package heroin. (Fri. Hearing at 116).

He notified the others on the team what had transpired, and, after a few minutes, four or five more officers arrived and crowded into the kitchen. (Fri. Hearing at 117, 146-47). Det. Harvey testified that neither he nor anyone else present searched the

5

apartment, until they received word that the search warrant had been signed. (Fri. Hearing at 117, 144-45). They waited for about an hour. (Fri. Hearing at 147). Det. Harvey testified that Ms. Blanks remained in custody and that she was not free to leave. (Fri. Hearing at 144). When the warrant finally came, the officers conducted a search of the apartment and uncovered heroin and drug paraphernalia.

The defendants were later charged with a number of drug related offenses. (Doc. 7, 79). They now ask the Court to suppress evidence and statements, based on alleged violations of the defendants' constitutional rights.

## II. Law and Argument

*The Challenge to the Stop, Search, and Arrest of Deondray Bradley*

Mr. Bradley begins by arguing that the police did not have reasonable suspicion to conduct a Terry stop, and that probable cause to arrest him was lacking. He maintains that the events leading up to his arrest are indicative of innocent behavior, because the police observed him merely driving from his home to the car wash. He points out, and investigators admit, that officers could not see or hear what happened inside the car wash bay.

In the Court's view, Mr. Bradley's version of the facts is not in accord with what investigators credibly testified happened on the day of his arrest. As explained below, the police were armed with a wealth of information, which reasonably formed the basis of not only reasonable suspicion, but probable cause. Moreover, Mr. Bradley is incorrect to suggest that the officers' inability to visually observe a hand to hand drug transaction is fatal to a finding of probable cause in this instance. This is because "the Fourth

6

Amendment does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect." United States v. Strickland, 144 F.3d 412, 415 (6th Cir. 1998) (emphasis in original).

As the phrase "probable cause" itself implies, the proper benchmark is not one of certainty but of probability, and a multitude of decisions from the Supreme Court on down make clear that officers need not directly observe criminal activity in order to establish probable cause. See, e.g., Illinois v. Gates, 462 U.S. 213, 244 n. 13 (1983) (probable cause does not require an actual showing of criminal activity).  Rather, "[t]he threshold for probable cause is based upon factual and practical considerations of everyday life that could lead a reasonable person to believe that there is a probability that an illegal act has occurred or is about to occur." United States v. Reed, 220 F.3d 476, 478 (6th Cir.2000).  "[P]robable cause is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and thus probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." Klein v. Long, 275 F.3d 544 (6th Cir.2001).

In this instance, given the constellation of events that occurred prior to the arrest and the facts known to the officers at the time, there was a fair probability, from a reasonable officer's standpoint, that Mr. Bradley had participated in an illegal drug transaction at the car wash. After spending an afternoon observing Carper and the informant attempt to obtain heroin, the police learned that Carper had arranged to meet his supplier, who went by the name "Chuck", at the car wash.  The police observed Mr. Bradley, also known as "Chuck" and known to have prior drug felonies, leave his home

7

and drive to the same car wash where Carper, the informant, and others were waiting. Mr. Bradley's arrival prompted Carper's announcement, heard by officers over the wire, that "his guy" had arrived. After spending a short amount of time in Mr. Bradley's bay, Carper returned to the informant and stated that he "got it." After stopping and searching Mr. Bradley, officers recovered $1,082. After the informant and Mr. Carper parted company, officers met with the informant and recovered 30 bindles of heroin. Based on these facts, it was reasonable for officers to believe that Mr. Bradley was in fact Mr. Carper's supplier "Chuck." It was also reasonable for officers to believe that Mr. Bradley had participated in a drug transaction.

Mr. Bradley argues however that, for all the police knew, he was simply getting his car washed, and that any inference of criminal activity is too speculative to amount to probable cause. In the Court's view, while innocent explanations for Mr. Bradley's actions might be imagined, none of them would seem very likely from the perspective of the police at that time, given all the information they had before them. Moreover, the defendant's insistence on the possibility of an innocent explanation begs the question before the Court, which is whether his actions taken in context "could lead a reasonable person to believe that there is a probability that an illegal act has occurred or is about to occur." See Reed, 220 F.3d at 478. Based on the facts described above, this question must be answered in the affirmative.

The defendant also asserts that the Court should treat any information the police learned through the informant as it would an anonymous tip. He cites to Alabama v. White, 496 U.S. 325 (1990), seemingly for the proposition that an anonymous tip standing alone is generally an insufficient basis for a finding of probable cause. The

8

defendant contends that after the police learned through the informant that Mr. Carper was waiting for someone named "Chuck," the police simply assumed this person was Deondray Bradley.

The trouble with the defendant's argument is that, even if the Court were to accept that the informant's information was no better than an anonymous tip, the police were able to corroborate, in real time, what they were hearing over the wire. Corroboration of an anonymous tip by "independent observations [either] substantiating the details of the tip [or] ... of activity reasonably arousing suspicion itself" may establish the requisite level of cause to warrant a search. United States v. Brand, 556 F.2d 1312, 1318 (5th Cir. 1977), cert. denied, 434 U.S. 1063 (1978). The police did not merely assume that Mr. Bradley and Carper's "Chuck" were one and the same, since Mr. Bradley, a known heroin dealer, appeared at the precise time and location that Carper was expecting his heroin supplier, "Chuck," to arrive. Although the police made certain inferences in order to conclude that Mr. Bradley was participating in a drug transaction, it did not require any fantastic inferential leap to connect the dots.  Therefore, the Court concludes that the police had sufficient probable cause to justify the stop, search, and arrest of Mr. Bradley.

### Whether the Affidavit Included Material, Intentional Misstatements of Fact or Omitted Facts in an Attempt to Mislead

The defendants argue that the warrant affidavit for the Center Avenue apartment contains false statements and omissions that were made with a reckless disregard for the truth. They maintain that the inclusion of the misstatements were necessary for the finding of probable cause, and that the omissions were made with the intention to

9

mislead the magistrate judge. The burden is on the defendants to prove allegations of perjury or reckless disregard by a preponderance of the evidence. Franks v. Delaware, 438 U.S. 154, 155–56 (1978).   If the defendants meet their burden, the Court sets aside the affidavit's false material and considers whether what remains is sufficient to establish probable cause. Id. at 156.  Where probable cause is insufficient, "the search warrant must be voided and the fruits of the search" suppressed. Id. However, incorrect statements due to mere negligence or innocent mistake are insufficient to void a warrant. Id. at 171.

First, the defendants challenge the averment that a police informant was "present during a controlled purchase of heroin from Deondray Bradley." And along similar lines, they challenge the statement that officers observed Mr. Bradley "meet with the informant and another individual." The defendants say that these are material falsehoods, because, in their view, the informant was not "present" for the transaction that allegedly took place in Mr. Bradley's wash bay, but rather was seated inside a car in another wash bay. As a consequence, the defendants argue, Mr. Bradley did not "meet" with the confidential informant.

In one sense, the defendants have a point, since it is undisputed that the informant was not present in the particular wash bay where Mr. Bradley allegedly sold Carper heroin. The informant sat alone in a car parked in another bay and did not interact with Mr. Bradley directly. Therefore, he was not present, in a strict sense, at the precise location where Bradley and Carper allegedly made the hand-to-hand, and he did not "meet" with Mr. Bradley in such a way that they might have said hello and shaken hands. Nonetheless, these facts are not so inconsistent with the statements made in the

10

affidavit that the words "present" and "meet" should be construed as misstatements of fact. To say that they should, would require a hypertechnical reading of the affidavit, rather than the commonsense approach recommended by the case law. See United States v. Greene, 250 F.3d 471, 478-79 (6th Cir.2001).

Taking a commonsense approach, and keeping in mind that search warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation," United States v. Ventresca, 380 U.S. 102, 108 (1965), the Court is satisfied that the affiant, Detective Susan Barker, did not intentionally misstate the facts.[1] In the Court's view, the averment that the informant was "present during a controlled purchase of Heroin," is reasonably consistent with the facts, in that the informant was at hand and present at the car wash when the alleged drug transaction took place. So too with the averment that Mr. Bradley met with the informant and another individual: a meeting occurred because they all gathered at a particular car wash, at a particular time, for the purpose of a drug transaction. The challenged language in the affidavit may be lacking in precision, but the Court concludes that, if anything, this was a result of inartful drafting rather than an intent to deceive. The defendants have failed to prove that the police intentionally or with reckless disregard

---

[1]    At the suppression hearing, Det. Barker credibly testified as to why she believed the affidavit is consistent with the facts. She explained, "The recordings showed that Deondray Bradley directed them to that location. That location was selected by him as a meet location. They were going there for a particular reason and purpose at a particular time for a common purpose, and that was to obtain heroin." In her view, the informant was present for this meeting.

11

for the truth misstated the facts when they included the words "present" or "met" in the warrant affidavit.

The defendants also argue that the police materially misstated the facts when they referred to the drug transaction as a "controlled drug purchase." The defendants contend that by characterizing it this way, the police were attempting to falsely convey that the purchase was monitored and witnessed by the police and the informant, when in fact it was not. The defendants suggest that the proper procedure for a controlled purchase is outlined in a DEA Office of Training publication. Because the informant did not directly purchase drugs from Mr. Bradley and the police lost surveillance during the hand-to-hand transaction, the defendants argue that it was not properly a "controlled purchase."

The government correctly points out that the DEA training publication is not binding on the police or this Court. Further, "[t]here is no Sixth Circuit case that sets out a definition of 'controlled purchase.'" United States v. Tice, 459 F. Supp. 2d 609, 616 (E.D. Mich.2006). Tice, however, reviews a number of cases involving controlled purchases and enumerates those characteristics common to them. Tice notes that "the term has acquired a meaning within investigative parlance that includes features designed to ensure that an informant is closely monitored and searched to ensure reliable investigative results." Id.  Controlled purchases typically involve the "use of pre-recorded funds, and the immediate transfer of the controlled substance to the officer after the transaction was consummated." Id.

In the present case, investigators began with the intention of conducting a controlled purchase from Mr. Carper. The informant made a recorded phone call to Mr.

12

Carper, in which Carper agreed to sell the informant heroin. The police then searched their informant, outfitted him with a wire, and provided him with marked bills. They maintained constant audio surveillance of the informant, and visual surveillance when possible. Of course, the police were forced to shift gears when an unforeseen factor, "Chuck," entered into the mix, and they necessarily lost some control over the planned transaction. However, they did not lose complete control, and certainly not so much control that the transaction could not fairly be considered a "controlled buy." Acting on a hunch, they placed an officer outside Bradley's home, and when he appeared they maintained almost constant visual surveillance over him from the time he left his home until they stopped him.  The only time officers were unable to keep track of the situation was for the few seconds that Carper spent in Mr. Bradley's wash bay. After the stop, they found marked bills on Bradley, and they recovered heroin from the informant. Although officers were unable to monitor the transaction 100% of the time, in the Court's view, this operation sufficiently bears the hallmarks of a controlled buy, such that the affiant did not misstate the facts by referring to it as such.

The defendants next contend that the affidavit falsely claims that after his arrest Mr. Bradley said "you will find something" in the apartment. The defendants point to an apparent contradiction in the federal affidavit for Mr. Bradley's arrest, which states that "Defendant was advised of his Miranda warnings and declined to make a statement." The government maintains, and the Court agrees, that while the two affidavits appear to be contradictory, the defendant's alleged statement that "you will find something" is not material to the finding of probable cause. As discussed in the section that follows, even

13

if the alleged statement were excised from the affidavit, what remains sufficiently supports probable cause.

Finally, the Court rejects the defendants' argument that, by omitting the fact that no drugs or contraband were found on Mr. Bradley after the stop, the affiant was attempting to mislead the magistrate. Generally, an "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." United States v. Allen, 211 F.3d 970, 975 (6th Cir.2000). Except where the defendant makes a strong preliminary showing that an omission was made with the intent to mislead, and the omission was critical to the finding of probable cause, the Franks standard is inapplicable. Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir.1998). In this instance, the defendants have not met their burden to show that Det. Barker meant to mislead the magistrate by omitting the absence of drugs or contraband. Even if the affidavit had included this detail, a finding of probable cause would still be warranted.

*The Sufficiency of the Affidavit*

This Court reviews the sufficiency of an affidavit in a "commonsense, rather than hypertechnical manner," and asks "whether the [judge] had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." United States v. Greene, 250 F.3d 471, 478-79 (6th Cir.2001) (internal quotation marks and citation omitted). "Probable cause for the issuance of a search warrant is defined in terms of whether the affidavit sets out facts and circumstances which indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." United States v. Finch, 998 F.2d 349,

14

352 (6th Cir.1993) (internal quotation marks and citation omitted). The warrant must establish "a nexus between the place to be searched and the evidence to be sought." United States v. Carpenter, 360 F.3d 591, 594 (6th Cir.2004) (en banc). " 'The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought.' " United States v. Frazier, 423 F.3d 526, 532 (6th Cir.2005) (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978)). "When reviewing a magistrate judge's probable cause determination, a reviewing court should give great deference to a magistrate judge's probable cause determination and reverse that decision only if it was arbitrarily made." United States v. Frechette, 583 F.3d 374, 379 (6th Cir. 2009) (citations omitted).

The warrant affidavit in the present case contains the following pertinent allegations:

> On February 9, 2011, A Summit County Drug Unit Confidential Informant was present during a controlled purchase of Heroin from Deondray Bradley, . . ., in the City of Akron. During the transaction Officers observed Bradley meet with the Confidential Informant and another individual.

> During the transaction, Officers observed Deondray Bradley meet with several other subjects for a short time. Deondray Bradley then left the area and was traffic stopped by Akron Police Department Snud Units. Deondray Bradley was found to be in possession of approximately $1,082 in U.S. Currency.

> Prior to the drug transaction on February 9 ,2011, Officer Harvey observed Deondray Bradley leave Apartment #11, at 475 Center Avenue, in the City of Cuyahoga Falls. Bradley was positively identified by Officer Harvey. Bradley left the area driving a 2006 Chevy Equinox, bearing temporary tag, T719906. Bradley was surveilled to the location of the drug transaction and surveillance was conducted of Bradley until the traffic stop was completed.

> Affiant is aware the Akron Police Department, Det. Mike Schmidt #1151 received information from a confidential informant that Deondray Bradley resided at 475

15

Center Avenue, apartment #11 in the City of Cuyahoga Falls. The information was also that Bradley transports large quantities of Heroin from Detroit, MI to the apartment on Center Avenue. Bradley then prepares the heroin for distribution at this residence and then distributes the said heroin from this location to various locations in the City of Akron.

Affiant is aware, that a search of utility records revealed that the electric was registered to Faith Blanks. Summit County Jail records on June 28, 2010, list Faith Blanks as Deondray Bradley's girlfriend.

On February 9, 2011, following the traffic stop of Deondray Bradley, Officer Harvey observed Faith Blanks arrive at the apartment, driving a Dodge Challenger bearing a Michigan registration.

Affiant is aware, that Deondray Bradley was advised of his Miranda Rights and interviewed by Sgt. Givens. During this interview, Bradley stated "you will find something" in the apartment.

The defendants first take issue with hearsay statements of the confidential informant. They contend that any reliance on this information is problematic because affidavit contains no statement establishing the informant's credibility or past reliability. Although the defendants are correct that there is no such averment in the affidavit, this is not fatal to a finding of probable cause. "[I]n the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration." United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005) (citing United States v. Woosley, 361 F.3d 924, 927 (6th Cir.2004)). In this instance, the affidavit indicates that the police did corroborate the information that "Bradley . . .distributes the said heroin from [the Center Avenue apartment] to various locations in the City of Akron." As stated in the affidavit, the police observed Mr. Bradley leave the apartment and drive to a location where he participated in a controlled sale of heroin, after which the police searched him and found a large sum of cash. In the Court's view, this

16

independent observation by the police provides a substantial basis for crediting the informant's story.

The defendants also argue that because the affidavit does not state the age of the confidential information, it should be disregarded on the principle of staleness. The standard of review for a staleness determination is the same as the standard for determining the sufficiency of an affidavit. See United States v. Canan, 48 F.3d 954, 958–59 (6th Cir.1995). A magistrate must determine whether, under the totality of the circumstances, probable cause exists to issue the warrant. See id. at 958. In this case, staleness is not a concern because officers corroborated, that day, that Mr. Bradley was distributing heroin from the apartment. See United States v. Spikes, 158 F.3d 913, 924 (6th Cir.1998) (subsequent corroboration will "refresh" stale information).

Next, the defendants raise the question whether the affidavit adequately sets forth a nexus between the evidence sought and the place to be searched. A warrant affidavit must contain particularized facts establishing "a nexus between the place to be searched and the evidence sought." United States v. Carpenter, 360 F.3d 591, 594 (6th Cir.2004) (en banc) (internal quotation omitted). The defendants contend there is no nexus because the apartment was leased to Faith Blanks, not Deondray Bradley. Further, no controlled buys took place at the apartment, and police never observed any drugs or contraband there.

Although it is true that the affidavit contained none of this information, this is not to say that it does not contain facts connecting the evidence sought, heroin in this case, to the Center Avenue apartment. Officers had confidential information that Bradley resided at Center Avenue and that he dealt heroin from that location. The affidavit shows

17

that this information was corroborated by the officer's surveillance of Bradley leaving the apartment and driving directly to the site of the drug transaction. The affidavit also contained Det. Barker's averment that those involved in illegal drug activity conceal quantities of drugs in their homes. Taking these statements together, the magistrate could reasonably infer that evidence of a crime would be discovered at the Center Avenue apartment.

This conclusion finds support in United States v. Gunter, 266 F. App'x 415, 419 (6th Cir.2008), in which a panel of the Sixth Circuit concluded that the requisite nexus existed where the affidavit indicated that officers had observed the defendant visiting his residence just before he traveled to the site of a drug sale. And, also like the present case, the affiant noted that in his experience drug dealers typically keep evidence of crime in their residences. Id. at 419. The court held that these facts sufficiently connected the residence to the drug evidence sought. Id.

The Court rejects the defendants' contention that United States v. McPhearson, 469 F.3d 518 (6th Cir.2006), demands a different outcome. In that case, officers arrested the defendant outside his home on a charge of simple assault. Id. at 520. After searching him they discovered a small quantity of crack cocaine.  Id. Based on this discovery, they obtained a search warrant for the defendant's residence, where they uncovered guns and more drugs. Id. at 520-21. The McPhearson court concluded that the affidavit did not describe a sufficient nexus because it did not include "an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes - namely, the independently corroborated fact

18

that the defendants were known drug dealers at the time the police sought to search their homes." Id. at 524.

Unlike the affidavit in McPhearson, the affidavit in this case contains the "additional fact" connecting the residence to the wrongdoing, namely, the officer's observation that Mr. Bradley left his residence and drove to the site of a controlled drug transaction.  The Court therefore concludes that the affidavit set forth facts and circumstances indicating a fair probability that evidence of a crime would be located at the Center Avenue apartment.

*The warrantless entry of the Center Avenue apartment*

The defendant Blanks challenges Detective Harvey's warrantless entry into her residence. As described in detail above, Det. Harvey stopped and arrested Ms. Blanks on the suspicion that she was associated with Deondray Bradley and that she was about to enter the Center Avenue Apartment. Then, he entered the apartment, prior to the issuance of the warrant, and conducted a "protective sweep."  Finding the apartment unoccupied, he and a number of other officers detained Ms. Blanks in her kitchen, while waiting for the search warrant. He observed drugs and paraphernalia in plain view, but claims he did not search the apartment.[2]

First, the Court observes that Det. Harvey stopped and arrested Ms. Blanks without probable cause. An arrest is deemed lawful when, at the moment the arrest was made, "the facts and circumstances within [the officer's] knowledge and of which [he]

_____

[2]     To the degree that Ms. Blanks's testimony was credible, it is the court's opinion that the few differences between her story and that of Detective Harvey are not material to the analysis that follows.

19

had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense." Beck v. State of Ohio, 379 U.S. 89, 91 (1964).  In this instance, Det. Harvey did not know Ms. Blanks's identity, and he had no other information on her.  The only things remotely suspicious about her were that she had been driving a car associated with Deondray Bradley and that she was attempting to enter an apartment for which the police were seeking, but had not obtained, a search warrant. Neither action is illegal, and, under the circumstances, neither action provided a reasonable grounds for believing that Ms. Blanks had committed or was committing a crime.

Next, the Court presumes that Det. Harvey's entry into the apartment was also unconstitutional, because he entered without having first obtained a warrant. See O'Brien v. City of Grand Rapids, 23 F.3d 990, 996 (6th Cir.1994). The government, however, argues the presumption can be rebutted, because exigent circumstances justified the warrantless entry. Exigent circumstances exist if the government can show a reasonable belief that third parties were inside the apartment, and a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order. United States v. Sangineto-Miranda, 859 F.2d 1501, 1512 (6th Cir. 1988).

The government does not meet its burden. Det. Harvey testified that he had no knowledge of anyone else being in the apartment. (Fri. Hearing at 150). He had no knowledge that anyone else residing in the apartment. (Friday Hearing at 150). And he did not describe any facts upon which one might have reasonably believed that the apartment was occupied. Det. Harvey only described his concern that some hostile

20

individual "could have been" inside the apartment. Although the Court is sensitive to the dangers inherent to law enforcement, Det. Harvey's concern does not amount to a reasonable belief either that some third party was inside or that destruction of evidence was imminent. The Court concludes that exigent circumstances did not justify the warrantless entry. Therefore, Det. Harvey's entry into the apartment was unreasonable under the Fourth Amendment.

*Application of the Inevitable Discovery Doctrine*

The exclusionary rule prohibits the admission of evidence seized in unreasonable searches and seizures, as well as derivative evidence acquired as a result of an unlawful search. Wong Sun v. United States, 371 U.S. 471, 484–85 (1963). In this instance, however, the government maintains that the inevitable discovery doctrine, an exception to the exclusionary rule, should apply. The inevitable discovery doctrine allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means. Nix v. Williams, 467 U.S. 431, 444 (1984).

For the exception to apply, it must be demonstrated that the evidence inevitably would have been acquired through lawful means had the government misconduct not occurred. Id. at 444; see Murray v. United States, 487 U.S. 533, 539 (1988). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." Nix, 467 U.S. at 444 n. 5. "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the

21

Case: 5:11-cr-00084-SL  Doc #: 121  Filed:  12/07/12  22 of 22.  PageID #: 633

unlawful search never occurred." <u>United States v. Eng</u>, 971 F.2d 854, 861 (2d Cir.1992), cert. denied, 510 U.S. 1045 (1994).

At the time Det. Harvey entered the Center Avenue apartment, Mr. Bradley had been arrested and the police had already started drafting the search warrant affidavit. The affidavit that was presented to magistrate judge reflected only facts that had been developed prior to the unlawful entry. The record shows that after his entry into the apartment, Det. Harvey did communicate, at least indirectly, with the affiant, but anything that might have been learned as a result of the illegal entry was not included in the warrant affidavit. (Fri. Hearing at 60-61). The evidence inevitably would have been acquired through lawful means had the unlawful entry not occurred.  Therefore, the Court concludes that the inevitable discovery exception applies. Suppression of the evidence, in this instance, is not required.


## III. Conclusion

For the reasons stated above, the defendants' motions to suppress are denied (resolving Doc. 52, 53, 54, 55, and 56).


IT IS SO ORDERED.

    /s/ Lesley Wells
UNITED STATES DISTRICT JUDGE

Date: 7 December 2012